UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:05CR595HEA(MLM) |
| ) | |
| EMILIO SAENZ and MELISSA SAENZ, ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on defendant Emilio Saenz's Motion to Suppress [Doc. 35] and defendant Melissa Saenz's Motion to Suppress Evidence and Statements [Doc. 43]. The government filed a written Response. [Doc. 49][1] Following the Evidentiary Hearing, defendants requested and were granted time to file post-hearing briefs.[2] [Doc. 57] The government again responded. [Doc. 63]

At the Evidentiary Hearing the government presented the testimony of DEA Special Agent James McHugh and St. Louis County Detective Gary Sodoma. Neither defendant presented testimony. The government and the defendants introduced numerous exhibits and the government supplemented the record following the hearing. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

---

[1] At the Evidentiary Hearing the court denied defendant Emilio Saenz's oral motion to strike the government's Response as untimely; granted the government's oral motion to file out of time; denied defendant Emilio Saenz's oral motion for a continuance and gave counsel for defendant Emilio Saenz time to read the government's Response.

[2] Counsel for defendant Melissa Saenz filed a Notice that she would not be filing a post-hearing brief. [Doc. 59]

# FINDINGS OF FACT

SA McHugh has been with DEA for four years. He has had training in the identification of controlled substances and the methods of operation of drug traffickers. Some of his testimony was based on information he received from other officers.

Prior to September 27, 2005 law enforcement officers in the St. Charles City Police Department had received information from a Confidential Source ("CS") about several persons in St. Charles who were involved in suspicious money orders and money transfers. Some of the transferees had drug trafficking records. Several of the transferors sent transfers to Angel Hernandez at a New Mexico address with a St. Charles phone number. On several occasions these persons came to the transfer facility, apparently under the influence of drugs, and inquired if the government could check on their transfers. A record check showed that Angel Hernandez had convictions for narcotics and through investigation of his phone number, officers learned he was Simon Hernandez's son and that they were living together. Simon Hernandez's criminal history showed convictions for assault on a law enforcement officer and for drugs. On at least one occasion Simon Hernandez made a transfer to Melissa Saenz. The CS recalled this transfer because any amount over $3,000 requires the transferor to produce identification and when asked for his ID, during a transfer to Melissa Saenz, Simon Hernandez became very upset.

The St. Charles Police Department did further investigation of Simon Hernandez and learned he was involved in a Mexican prison gang in Texas and was one of the subjects of a large federal investigation involving narcotics and money laundering, known as "the Mexican Syndicate".

As part of this investigation, law enforcement officers periodically drove by Simon Hernandez's residence at 142 Lake Ridge in St. Charles, Missouri. On 9/27/05, law enforcement officers drove by his house because they had just received information from a second CS that Melissa Saenz was in the St. Charles area. Because her name had come up before in the investigation, they checked further. When they drove by, they observed a red Ford F150 pickup

truck with Texas plates registered to Emilio Saenz. They ran his record and discovered convictions for Burglary and Car Theft and that he was on current active parole from the State of Texas.

Officers in the St. Charles City Police Department and the St. Louis County Police Department set up surveillance of the residence. They observed a blue Ford F150 pickup truck with Texas temporary tags arrive at the residence. Emilio Saenz and Melissa Saenz exited the blue F150 and entered Simon Hernandez's residence. Later they saw Emilio Saenz leave the house, enter the blue truck, drive it into Simon Hernandez's garage and close the door behind him. SA McHugh testified that based on his experience and training he knows that Mexican drug traffickers frequently use garages to load and unload drugs. After less than thirty minutes, the blue truck pulled out of the garage, driven by Emilio Saenz with Melissa Saenz as passenger. The truck went to a BP Am0co gas station. When the defendants left the gas station, Melissa Saenz was driving and Emilio Saenz was the passenger.[3]

The blue truck went east on I-70, south on I-270 and west on I-44. Law enforcement officers believed that Emilio Saenz and Melissa Saenz had money or drugs in the truck and were heading back to Texas. This belief was based in part on information from a CS that "they came here to deliver dope to Simon."

The sergeant supervising the investigating unit called for a marked county police car to stop defendants' vehicle. PO Doyle made the stop.[4] Det. Gary Sodoma, who has been in the St. Louis County Police Department since 1989 and assigned to the Narcotics Unit since 1994, has received training in the identification of controlled substances and methods of operation of drug traffickers.

---

[3] There was extensive cross examination about previous testimony concerning who was driving and when. After checking with other officers, SA McHugh concluded that the driver was first Emilio Saenz, then later Melissa Saenz as set out above.

[4] There was testimony that Detective Larry Fox had observed a traffic violation on I-270 and radioed it to the sergeant. There is a report that says PO Doyle observed several traffic violations. The traffic violations are not visible on the video taken from PO Doyle's police car, however, the video camera only goes back one minute prior to the patrol vehicle's lights being activated. In any event, it is the government's position that the stop was based on reasonable suspicion, not a traffic violation, the subsequently issued traffic citation notwithstanding.

He was part of the investigation of Simon Hernandez and was in the surveillance team following the blue truck from Simon Hernandez's residence. He believed that Emilio Saenz and Melissa Saenz either brought narcotics from Texas or were taking money back to Texas, or both. He testified he saw the marked County police vehicle make the stop and arrived at the scene within one minute. Det. Sodoma approached the truck which was curbed on the right shoulder of I-44. He identified himself, showed his badge and interviewed the driver, Melissa Saenz. He asked where she had been and where she was going and the purpose of her trip. She said she came to St. Louis to sell a red pickup to Simon, her bother's friend. Melissa Saenz did not know how much she got for the sale of the car and although she thought the money was in the blue truck, she did not know where.

Det. Sodoma then spoke to Emilio Saenz. He said the purpose of his trip was to sell a truck to Simon Hernandez. He did not know the amount for which the truck was sold. He did not know if it was fully paid for and he stated there was no money from the sale in the truck. Neither defendant was restrained or handcuffed. No threats or promises were made to either defendant and there was no ruse employed to trick them. Neither defendant said that he/she did not want to talk to Det. Sodoma.

Det. Sodoma asked if they both were from Texas and noted that a lot of narcotics came from Texas to this area. He asked if there were any narcotics in the truck. He asked the defendants separately if he could search the truck and each responded in the affirmative. He returned Melissa Saenz's driver's license and keys to her and asked her to pull the blue truck up the ramp at Antire Road in order to get the vehicle off the highway and into a safer location. Melissa Saenz was the driver and Emilio Saenz was the passenger as she drove the truck up the ramp about one-fourth mile to the shoulder at the top of the hill. Again Det. Sodoma asked each defendant if he could search and each responded "yes". He asked if they minded if he searched with his dog "Scooter."[5]

---

[5] Det. Sodoma has been Scooter's handler for three years. Both are certified from the Global Training Academy in Texas. Gov. Ex. 4 is a looseleaf binder with all of Scooter's credentials, training certificates and certifications. The defendants do not challenge Scooter's credentials.

Each defendant said he/she did not mind. Melissa Saenz appeared to be approximately 30-35 years old, her answers to questions were appropriate, and she appeared of normal intelligence with no mental defects. She did not appear intoxicated or high. No threats or promises were made to induce her to consent.

Scooter was at the scene in Det. Sodoma's police car. Det. Sodoma retrieved Scooter and searched the outside of the truck. Scooter alerted at the rear of the truck by the tailgate indicating the past or present presence of narcotics. Scooter uses a passive alert, that is, he sits when he detects the odor of narcotics. The walk-around and alert took place about 5-10 minutes after Det. Sodoma first arrived on the scene.

The rear tailgate showed signs that parts of it may have been removed. The bolts were scratched as if someone had recently been inside. Further search revealed no contraband in the tailgate.

Det. Sodoma looked under the truck where the spare tire hangs. It was smudged and there was a ring around it and smudgy fingerprints. He obtained a tire tool lying in the back of the truck and removed the tire. The tire was heavier than normal and when it was rolled, he could hear something "thunking." He asked each defendant if they had had a flat tire. Each said no. He asked if they minded his looking inside the tire. Each said no. He obtained a pocket knife and looked inside the tire where he found a significant amount of United States currency.[6] Three cell phones in the cab of the truck were also seized. Emilio and Melissa Saenz were placed under arrest. Emilio Saenz was searched incident to his arrest and $3,500 on his person was not seized at that time.

SA McHugh testified that on 9/27/05 he was contacted by his supervisor and told to respond to the Antire Road exit regarding the stop of a vehicle at that location. When he and his partner, Steve Hoefer, arrived Melissa Saenz was in front of the truck and Emilio Saenz was next to the

---

[6] There was **extensive** cross examination about the amount of money recovered. SA McHugh first reported $116,000 based on the markings on the bundles of cash. A subsequent bank count showed $128,160; a later report states $131,660 was seized. This latter figure includes $3,500 taken from Emilio Saenz's person at booking.

police car already at the scene. He spoke to the officer at the scene and learned that the drug canine had alerted and that Det. Sodoma had obtained consent to search. He learned that a significant amount of cash had been located in the truck's spare tire. SA McHugh and his partner spoke to Melissa Saenz. She was handcuffed at the time and requested a tissue because her nose was running. He uncuffed her and gave her a tissue. He identified himself and told her he was there as part of a narcotics investigation. He told her he wanted to speak to her and advised her of her Miranda Rights by reading from the DEA 13A card (Gov.Ex.1) which states:

Oral Warning to be Given to a Subject Prior to Interrogation

> Before we ask you any questions you must understand:
> - you have the right to remain silent.
> - anything you say can be used against you in court.
> - you have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
> - if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> Do you understand? Are you willing to answer some questions?

Melissa Saenz said she understood the rights and was willing to answer questions. He asked the purpose of her trip and she said she drove her red F150 from her home in Texas to Wichita, Kansas to meet her brother in his blue F150. They came to St. Louis to sell the red truck to her brother's friend, Simon. She said the sale money was in the truck but she did not know where. SA McHugh told her they found a lot of currency in the tire and asked if she knew anything about it. She said she did not. She signed a "Disclaimer" disclaiming any ownership of the currency seized. (Gov.Ex.2) No threats or promises were made to induce her to execute the form. At no time did she say that she wanted to stop talking or that she wanted an attorney. Upon further questioning, SA McHugh told her about the drug canine alert and that she and her brother had been seen at Simon Hernandez's residence. She did not respond at first. SA McHugh told her he believed she and her brother delivered cocaine to Simon Hernandez. He said it could be beneficial to her if she cooperated. Melissa Saenz admitted they had delivered the narcotics but said she did not know the

quantity. She said her brother drove the blue truck into the garage and unloaded the narcotics while she stayed inside the residence and watched TV with Simon Hernandez's wife.

SA McHugh then spoke to Emilio Saenz. SA Steve Hoefer advised him of his <u>Miranda</u> Rights by reading from the DEA 13A <u>Miranda</u> Rights Form, the same as had been done with Melissa Saenz. (Gov.Ex.1) SA McHugh identified himself, SA Hoefer and Det. Senter, told Emilio Saenz of the drug investigation and asked Emilio Saenz the purpose of his travel. Emilio Saenz said he had come to St. Louis to help his sister sell her red Ford F150 to Simon Hernandez. He said he had no idea the amount Simon Hernandez paid for the vehicle and that there was no money in the blue F150. SA McHugh asked him about the money in the tire and Emilio Saenz denied all knowledge of it. He signed a "Disclaimer" disclaiming any ownership of the currency seized. (Gov.Ex.3) No threats, promises or coercion of any kind induced him to sign the form. SA McHugh told Emilio Saenz about the drug canine alert and that he believed Emilio Saenz and his sister delivered cocaine to Simon Hernandez. Emilio Saenz said he wanted to speak to an attorney and the interview was terminated.

At booking, $3,500 was seized from Emilio Saenz's pants pocket. In addition, his wallet, some keys and his birth certificate were seized.

The above statement of facts are those facts found credible by the undersigned. The court acknowledges that on cross examination counsel raised numerous inconsistencies and frailties in the testimony and the overall quality of the police work. These include the traffic stop/reasonable suspicion theory for the stop; the amount of currency seized; the date on the dog alert report; the confusion over which defendant was driving; why the red truck was not seized; the total lack of evidence at the hearing that Simon Hernandez was taking over the payments on the red truck; the use of the drug canine after the defendants consented to the search; the lack of seizure or fingerprinting of the tire tool; the lack of fingerprinting or photographing of the blue truck and the scrape-marks on the tailgate and smudges on the tire, etc. Each of these is addressed fully in the government's Reply to Emilio Saenz Post-Hearing Brief. [Doc. 63] These issues are trial issues going

to the credibility of the witnesses on the issue of guilt or innocence. They do not relate to suppression issues. To the extent they can be construed to relate to suppression, they will be addressed below.

## **CONCLUSIONS OF LAW**

**1. The Stop**

Police officers are permitted to conduct "investigative stops" if they have reasonable articulable suspicion that criminal activity may be afoot. <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968); <u>United States v. Watts</u>, 7 F.3d 122, 125 (8th Cir. 1993). Automobiles, as well as people, are subject to <u>Terry</u> stops. <u>Watts</u>, 7 F.3d at 125.

An officer may rely on information provided by other officers and all of the information known to the team of officers involved in the investigation to provide justification for a stop. <u>United States v. Gonzales</u>, 220 F.3d 922, 925-26 (8th Cir. 2000)(state trooper who received description of vehicle from investigator had probable cause to arrest driver of vehicle); <u>see</u> <u>also</u> <u>United States v. Gillette</u>, 245 F.3d 1032, 1034 (8th Cir.)(when officers worked together on an investigation, "collective knowledge" theory may be used to impute the knowledge of one officer to another); <u>cert. denied</u>, 122 S.Ct. 415 (2001); <u>United States v. Robinson</u>, 119 F.3d 663, 666 (8th Cir. 1997).

In the present case, the investigating team had information from a CS that numerous individuals had been making suspicious money transfers. Sometimes they asked if the government could check on their transfers. Some of the transfers went to Angel Hernandez, the son of Simon Hernandez. Several of the transferees had drug trafficking records. On at least one occasion Simon Hernandez transferred money to Melissa Saenz in Texas and became upset when he had to produce identification because the amount was over $3,000.00. A check of Simon Hernandez showed he was the subject of a drug trafficking investigation in Texas. On 9/27/05 officers saw a red Ford F150 with Texas plates parked at Simon Hernandez's residence. Emilio and Melissa Saenz arrived in a blue F150 pickup with Texas plates. The blue truck was driven into the garage, the doors closed

and a short while later it exited. After stopping at a gas station, it went east on I-70, south on I-270 and west on I-44.

The Supreme Court has repeatedly said that in making reasonable-suspicion determinations, courts must look at the "totality of the circumstances" in each case. United States v. Arvizu, 534 U.S. 266 (2002). This includes an examination of whether the detaining officer has a "particularized and objective basis" for suspecting legal wrong doing. Id., quoting United States v. Cortez 449 U.S. 411, 417-418 (1981). The process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." Arvizu at 273, quoting Ornelas v. United States, 517 U.S. 690, 699 (1996). "Although an officer's reliance on a mere 'hunch' is insufficient to justify a stop, Terry, supra, at 27, 88 S.Ct. 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, at 274 citing United States v. Sokolow, 490 U.S. 1, 7 (1989). An analysis of what amounts to reasonable suspicion need not rule out the possibility of innocent conduct, see Illinois v. Wardlow, 528 U.S. 119, 125 (2000), and the overall determination should be based on the cumulative effect of all factors that make up the totality of the circumstances in each case. Arvizu at 274.on I-70, south on I-270 and west on I-44. The totality of the circumstances shows that there was clearly reasonable suspicion that Emilio and Melissa Saenz had delivered narcotics to Simon Hernandez and were on their way back to Texas with the money from the sale. The stop of the blue F-150 was lawful based on the totality of the circumstances.

Defendant Emilio Saenz argues that because the criminal Complaint states the stop was based on observed traffic violations, the credibility of the government's evidence is in question. The government explains that the Complaint mentioned only the traffic violations in order not to compromise the on-going investigation. This is a reasonable explanation and in fact, there was testimony at the hearing that PO Doyle observed traffic violations and that Det. Larry Fox had earlier observed violations which he radioed to his sergeant. The fact that traffic violations do not

appear on Officer Doyle's video is explained by the fact that the video only goes back one minute after the activation of the lights. The traffic violations alone form probable cause for a stop. However, the primary basis for the stop was reasonable suspicion, a theory which is fully supported by the evidence.

Following the stop, the officer was entitled to conduct an investigation "reasonably related in scope to the circumstances that justified the interference in the first place." United States v. Cummins, 920 F.2d 498, 501 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).

There is no bright line of demarcation between investigative stops and arrests. United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995). A *de facto* arrest occurs when the conduct of the officer is more intrusive than necessary for the investigative stop. Bloomfield, 40 F.3d at 916-17; United States v. Jones, 759 F.2d 633, 643 (8th Cir.), cert. denied, 474 U.S. 837 (1985). Time is an important factor in making this distinction between an investigative stop and a *de facto* arrest, but there is "no rigid time limitation on Terry stops." Bloomfield, 40 F.3d at 917, quoting United States v. Sharpe, 470 U.S. 675, 685 (1985). Here, Det. Sodoma arrived immediately after the stop and questioned the defendants about the purpose of their travel.

An officer at a traffic stop can check the driver's identification and vehicle registration, ask the driver to step out of his vehicle and ask routine questions concerning the driver's destination and the purpose of his trip. United States v. Long, 320 F.3d 795, 799 (8th Cir. 2003). See also United States v. Gomez Serena, 368 F.3d 1037, 1040 (8th Cir. 2004) (A reasonable investigation of a justifiable traffic stop may include checking the driver's license and registration, asking the driver to step out of the vehicle, asking the driver to sit in the patrol car, and requesting the driver's destination and purpose); United States v. Gregory, 302 F.3d 805, 809 (8th Cir. 2002); United

States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994). In the instant case, the investigative detention was brief and no longer than necessary.

2. **Consent**

Det. Sodoma requested consent to search, twice, and both times each defendant consented.

Persons may give up their Fourth Amendment rights by consenting to a search. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). Such consent must be given freely and voluntarily. Id. In determining whether a consent to search was given freely and voluntarily, the court must examine the totality of the circumstances under which it is given. United States v. Mendenhall, 446 U.S. 544, 557 (1980); United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990); United States v. Lee, 886 F.2d 998, 1000 (8th Cir. 1989), cert. denied, 493 U.S. 1032 (1990). Consent to search may be given by the criminal suspect or by some other person who has common authority over the premises or item to be searched. United States v. Matlock, 415 U.S. 164, 171 (1974); United States v. Bradley, 869 F.2d 417, 419 (8th Cir. 1989). A search may be valid when based on the consent of a party whom the police reasonably believe to have authority to consent to the search even if it is later determined that the party did not in fact have such authority. Illinois v. Rodriguez, 497 U.S. 177, 185-186 (1990).

The inquiry must then turn to whether the consent was voluntary. The burden is on the government to show that the consent was voluntary under the totality of the circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). There are numerous factors a court should consider in determining whether consent was freely and voluntarily given. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). In Chaidez, the Eighth Circuit noted that:

> courts should ask whether the person who consented: (1) was detained and questioned for a long or short time, . . . (2) was threatened, physically intimidated, or punished by the police, . . . (3) relied on promises or misrepresentations made by the police, . . . (4) was in custody or under arrest when the consent was given, . . . (5) was in a public or secluded place, . . . or (6) either objected to the search or stood by silently while the search occurred.

Id. at 381 (citations omitted).

Here, the defendants were detained for only a brief period. They were not threatened, intimated or punished. Det. Sodoma made no promises to them. They were not under arrest, but merely temporarily detained. They were on a public highway exit ramp and they drove to the top of the ramp themselves before consenting. Neither objected to the search. The search of the blue F-150 was lawful.

**3.     The Dog Sniff**

Defendant Emilio Saenz argues that the dog sniff after the consent was somehow unnecessary and/or improper. The impropriety of the officer's obtaining both consent and a dog sniff is not supported by case law or logic. It is clear that a dog sniff conducted during a traffic stop that is "lawful at its inception and otherwise executed in a reasonable manner" does not infringe upon a constitutionally protected interest in privacy. United States v. Martin, 411 F.3d at 1002 quoting Illinois v. Caballes, ____ U.S. ____, 125 S.Ct. 834, 837 (2005). A dog sniff may be the product of an unconstitutional seizure, however, if the traffic stop is unreasonably prolonged before the dog is employed. Id. To establish an unreasonably prolonged detention, a driver must show that he was detained beyond the time justified by the traffic stop, and that the detention was not supported by reasonable suspicion. Martin, 411 F.3d at 1002. Here, the dog was already present on the scene in Det. Sodoma's car. There was absolutely no delay and the dog sniff was proper and reasonable.

After the dog alerted to the presence of narcotics, there was probable cause to search the vehicle and, therefore, the automobile exception to the warrant requirement comes into play. United States v. Bloomfield, 40 F.3d 910, 919 (8th Cir. 994). Probable cause means "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). A dog alert, without more, gives probable cause for searches and seizures. Bloomfield, 40 F.3d at 919; United States v. Maejia, 928 F.2d, 810, 815 (8th Cir. 1991) ; United States v. Longbehn, 898 F.2d 635, 640 (8th Cir. 1990). If there is probable cause to believe an automobile contains contraband, a warrantless search of the automobile is reasonable. United

States v. Ross, 456 U.S. 798, 809 (1982); Chambers v. Maroney, 399 U.S. 42, 52 (1969). The automobile exception to the warrant requirement includes containers found in the automobile. Ross, 456 U.S. at 822.

If police have probable cause to search a car, they need not get a warrant first even if they have time and opportunity. United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993); United States v. Crabb, 952 F.2d 1245, 1246 (10th Cir. 1991), cert. denied, 112 S.Ct. 1981 (1992). Therefore, in the present case the search was based both on consent and on the probable cause provided by the dog sniff.

A positive dog sniff is evidence of probable cause for forfeiture. United States v. $150,660, 980 F.2d 1200 (8th Cir. 1992); United States v. $91,960, 897 F.2d 1457, 1463 (8th Cir. 1990). The money seized and forfeited should not be suppressed.

**4.    Statements**

Defendant Emilio Saenz does not challenge the admissibility of his statements.

As for defendant Melissa Saenz, she was advised of her Miranda Rights as more fully set out in the above Findings of Fact.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" Dickerson v. United States, 530 U.S. 428, 444 (2000). The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Haynes v. Washington, 373 U.S. 503 (1963); Colorado v. Connelly, 479 U.S. at 170. However, as the Supreme Court stated in Berkemer v. McCarthy, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433 n. 20; Dickerson, 530 U.S. at 444.

In the present case, Melissa Saenz was unhandcuffed, given a tissue for her runny nose and was fully advised of her rights. Although she was told it might be beneficial to be cooperative, no promises of any kind were made to her. Her will was not overborne. This is clearly not one of the "rare" cases to which Berkemer refers. Melissa Saenz's statements should not be suppressed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that defendant Emilio Saenz's Motion to Suppress be DENIED. [Doc. 35]

**IT IS FURTHER RECOMMENDED** that defendant Melissa Saenz's Motion to Suppress Evidence and Statements be DENIED. [Doc. 43]

This case has been set for Trial on **February 21, 2006** at **9:30 A.M.** before the Honorable Henry E. Autrey.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this   5th    day of January, 2006.